THOMAS BUFORD *v.* DUMESNIL & Co.

Commission Merchants — Duty to Consignor — Good Faith.

1. The general rule is that it is the duty of a commission merchant to sell whenever a sale can be made at a profit, or to sell when it is necessary to raise money to meet bills drawn on the property that were maturing, and for failing to do so he is responsible to the consignor.

Same.

2. But when the owner provides for meeting the bills and for paying any balance against him, and instructs his merchant to hold the property, then the obligation ceases.

Same.

3. In the absence of a peremptory order to sell at any named price or within a given time, some discretion was left to the consignees, and if they held the pork in good faith for a higher price they cannot be made responsible to the consignor for any loss.

APPEAL FROM FRANKLIN CIRCUIT COURT.

May 30, 1867.

OPINION OF THE COURT BY JUDGE PETERS:

Two appeals are prosecuted on this record, and as the one named in the caption stands first in order it will be first disposed of.

It is alleged in the petition of appellees that appellant is justly indebted to them in the sum of $33,704.49, for moneys advanced and paid out to the use of appellant, and at his special instance and request, the particulars of which are set forth in an account filed, as part of said petition, marked "A No. 1," and which account shows when said several sums were advanced and paid out. It is furthermore alleged that appellant had conveyed his property with the fraudulent intent to cheat, hinder, and delay his creditors, that he had conveyed his real estate to R. A. Alexander, and all his slaves with all, or part of his personal estate, to Adams and John Harper, or one of them. The Harpers and

Alexander were all made defendants, and attachments obtained against them, but the attachments were discharged and as the judgment discharging them and dismissing the action as to Alexander and the Harpers is not complained of, no farther notice will be taken of that branch of the case.

Buford filed an answer which was intended to be responsive to and was treated as his answer to this action, and also to the action of Dumesnil & McIlvain, brought against him at the same time and in the same court that this was brought.

The two actions were prepared and heard together, and a judgment rendered in each case at the same time.

The two causes were referred to a special commissioner and by consent the venue was changed from the Woodford to the Franklin Circuit Court where they were finally tried.

The master, thus appointed, was required to audit and state the accounts between the parties and report the result of his labors and examinations to the court. It was further agreed by the parties that the deposition of appellee Dumesnil, which had been taken in the action of the Agricultural Bank against appellant and others, should be read as evidence on the trial of these two actions, and that said deposition was offered as evidence by appellant.

On the 14th of October, 1863, the commissioner filed his report in which he states the shipments of pork to the New York and New Orleans houses were regularly reported and accounted for by them to Dumesnil at Louisville, all of which are regularly stated in the account of sales and in the account current filed, and that there was no evidence of neglect or inattention on the part of plaintiffs to the business of defendant, or disobedience to his orders in relation to the business; that it seemed to be the interest of plaintiffs to make speedy sales to relieve them from heavy and pressing liabilities, while Buford was interested in lifting up the market, not regarding time so much.

The commissioner states further that account " No. 1 " shows that there is owing by Buford to Dumesnil & Co., of Louisville, the sum of $33,704.49, and he further states, upon testing the figures, this sum seems to be correctly stated and was due the 24th of October, 1859. And at the close of the account there is a statement that there were seven bills of exchange, amounting to $42,000 in the aggregate, remaining unpaid, but forming no

part of exhibit "No. 1," and the master says, as they are not proved, the presumption is they were used by Dumesnil & Co. for their own private benefit. He further reports that, on account of the repeated drawing and redrawing of bills of exchange for the same amounts, the correctness of the account therefor or the charges for said bills could not be satisfactorily tested.

After stating other facts, not deemed material to recite here, he concludes as follows: "Thus I have carefully reviewed all the papers in the cause and believe the result to be correctly stated."

To this report exceptions were filed by appellant, all of which were overruled and judgment rendered against him in favor of appellees for the amount reported to be due them by the master, to-wit, $33,704.49, with interest thereon from the 18th of February, 1860, instead of the 24th of October, 1859, until paid, and costs, and from which this appeal is prosecuted.

Appellees earnestly insist that the judgment cannot be reversed because the allegations of the petition are not controverted by the answer, and that appellees would have been entitled to judgment without the introduction of any evidence. That the answer fails to deny directly and specifically the allegations of the petition, or any *infirmative* in relation thereto upon which to found a belief, and the same might, therefore, have been taken for confessed.

The allegations of the *petition* are very general, charging an indebtedness of appellant for money paid out and advanced for him, and at his instance and request, without any statement of the business connections or dealings between the parties, but refer to an account filed as an exhibit to show the particular amounts advanced at various times, and, perhaps, the persons to whom the different sums were paid.

Appellant in his answer, after denying an indebtedness by him to appellees in the amount claimed, or any other amount whatever, and charging the account and exhibits to be false and fraudulent, proceeds to very great length and in detail to give a history of his transactions and dealings with appellees, and the two houses with which appellee Dumesnil was connected, the one in New York and the other in New Orleans, stating the quantity and value of property purchased by him and placed in possession of appellees, as his commission merchants, the opportunities they

had while standing in that relation to him to sell and dispose of said property advantageously and profitably to him, and their failure to do so, either from negligence or want of skill in the business in which they were engaged. Or that they had made sales of portions of his property at saving prices and fraudulently concealed the facts from him by making false reports thereof and exhibiting accounts of sales at lower prices than were actually obtained, whereby, instead of large profits which could have been realized by a skillful· and faithful management of his business ruinous losses were brought upon him. The alleged wrongs and injuries he makes the subject of a counterclaim and seeks redress therefor in his answer. These denials and statements in the answer, considered in connection with the transactions which gave rise to this litigation and the allegations of the petition, must be taken as altogether sufficient to put appellees on the proof of the facts alleged.

As to the partnership alleged by appellant in his answer to have been formed by himself and appellee Dumesnil, by which the latter became interested in the purchases of pork, etc., and the speculations of the former to the extent of one-third interest, we need only remark that there is no proof of any such agreement, and that subject will be dismissed from further consideration.

Speculations of the magnitude of those in which appellant had embarked, requiring an outlay of such sums of money as would be appalling to men of moderate means, and unaccustomed to operations, such as none but the boldest adventurers at great commercial points rarely engage in, by even a small decline in the price of the article must bring great loss if not absolute ruin upon him, we would be authorized to assume, even in the absence of direct proof, would engage his undivided, or at least constant attention. Whatever might have been his confidence in the skill and integrity of his consignees, but the proof shows that appellant was attentive to everything pertaining to this business — he was frequently in Louisville holding consultations with appellees and, when not present, often corresponding with them, he was watchful of the state of the market and vigilant in the pursuit of all the information he could get on the subject.

But it is insisted by counsel that it was the duty of appellees to sell appellant's pork in their hands, whenever a sale could have been made at a profit, or to sell whenever it was necessary to raise

money to meet bills drawn on the property that were maturing, and for failing to do so they should be held responsible. This is certainly the general rule on the subject; but when the owner provides for meeting the bills and for paying any balance against him, and instructs his merchant to hold his property, then the obligation ceases, and if he sells he does it at his own risk.

Appellant commenced his purchases in November, 1858, and continued to make purchases occasionally through the following months of December, January, and February, and the lot last purchased was delivered on the 1st of March, 1859; during this time very little, if any, of his pork had been sold, although it was in demand at fair prices, reaching, in the month of February, $19.50 per barrel, and if appellant had sold at that price, he would have certainly realized a large profit. But it was not his purpose or intention to sell for the price which he then could have gotten, for, as the evidence clearly establishes, he confidently believed that the price would not only be higher, but would, in the language of a witness, reach even a "*fabulous*" point, and his letter of the 4th of March, 1859, shows he was negotiating paper to meet bills then maturing; besides, he could have realized a profit of $1 per barrel on the pork (1,000 barrels) for which he had contracted, to be delivered on the first of that month, which he declined. After the date of the letter referred to the price of pork rapidly declined, until about the 13th of May, when there was considerable excitement in the pork market, which lasted, as some of the witnesses say, three or four days, although some think it continued as long as a week or ten days, and during that excitement some sales were made as high as $19.50 per barrel. But from the decline in March, appellees were restrained from making sales by appellant, which appears from his letters and from other evidence. In his letter, under date the 13th of March, 1859, he speaks of the check he had sent to appellees upon Lexington, to meet a debt due the 5th, and of having arranged with the Agricultural Bank to meet the bill maturing in New York on the 20th of that month, and urges them to manage the money matters that month, and encourages them by assurances of higher prices and profitable results, promising to do all he can to beat the "*N 4*" provision dealers who were combining, as he believed and suggested in his letter of the 4th, to reduce and keep down the price of pork.

3

And in his letter of the 1st of April he refers to the "sad intelligence of a very gloomy market," communicated by their letter of the day before; he then expresses his doubts whether a change for the better would occur before May, on account of the power of the house of Hewett & Co. and its branches throughout the United States to destroy what life there was in the trade, until it would be to their interest to strengthen it, and then advises the withdrawal of the mess pork from the market, if they were able to get through without selling any.

On the next day he wrote again, requesting some bills on New Orleans to be sent up to him, suggests that the expense is greater than he likes, but says he will stand up to the unnatural persecution as long as he has a dollar, and tells them to have no fears for the future.

In his subsequent letters, up to May, the same determination to hold his stock of pork for higher prices is indicated; and this brings us to the rise in May.

During that excitement in the pork market, appellant was in Louisville, went from there to Cincinnati, and returned to Louisville, and, on the steamer returning, he told the witness Andors he had been offered $18 per barrel for his pork and would not take it, when the witness replied if it had been his he would have taken that price; appellant said it was not necessary, he thought, to sell at $18 when he was satisfied it would go to $20 or $22. Before he left Louisville for Cincinnati, he said, in speaking of the offer, he was going to Cincinnati, and if he could not do better he would take the offer. Buford and Dumesnil were both anxious and determined to sell for the highest market price, and doubtless were endeavoring to effect sales; but while there were sales at figures over $18, there is no evidence that either of them was ever offered more than that, which appellant refused to take, and while endeavoring to get more the opportunity of even getting that price escaped, and they made no sales for the reaction was as sudden as unexpected. There cannot, therefore, be found even a pretext for holding appellees responsible for a failure to sell the pork which was in Louisville and Cincinnati during the transient rise in May.

On the subject of the pork shipped to New Orleans, it does not appear that there was a peremptory order to the house to which it was shipped to sell at any named price, or within a given time;

some discretion as to these matters was left to the consignees necessarily, and if they, *in good faith,* held the pork for a higher price than that which was offered, they cannot be made responsible for failing to sell at the offer of $19.50 per barrel, although it would have been an advantageous sale for the owner, especially when the fall, as in this case, was so sudden and unexpected to dealers generally.

Nor are the statements of Merriweather sufficiently explicit and direct to found judicial action upon.

He says it is his best *impression* that Dumesnil told him he had 1,000 or 2,000 barrels of Mr. Buford's pork at New Orleans at $19 or $19.50 per barrel; he is uncertain as to quantity and price, and only says it is an *impression,* the best, doubtless, he had, that such a conversation occurred between them. Dumesnil, in his deposition, denies that such a sale was made, and on the 23d of May sends, in a letter to appellant, a copy of a dispatch from New Orleans, informing them that no sale had been then made.

But it is insisted, finally, that there is not sufficient evidence to sustain the judgment.

The cost of the pork is set out, with the names of the persons from whom it was purchased; appellant has failed to show any errors in either debits or credits, and although the names of persons to whom pork was sold are not always given, yet the dates of sales and prices are, and if the prices obtained were less than the market price when the sales are reported to have been made, the facts could have been easily proved.

Besides appellee Dumesnil was introduced as a witness by appellant, and he proves a much larger sum to be due than that for which the judgment was rendered.

The record failed to show any negligence or inattention on the part of appellees to the business or interest of appellant, but, on the contrary, it is shown that they used all reasonable efforts to carry out his instructions and advance his interests throughout.

The judgment must be *affirmed.*